**FILED**

APR 13 2007

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
Deputy Clerk

**ENTERED**

APR 16 2007

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

In re:

EUGENE H. PERRINE, JR.,

Debtor.

Case No. RS 05-13979 PC

Chapter 7

Date: February 26, 2007
Time: 9:30 a.m.
Place: United States Bankruptcy Court
Courtroom # 303
3420 Twelfth Street
Riverside, CA 92501

**AMENDED
MEMORANDUM DECISION**

Steven M. Speier, Chapter 7 Trustee ("Speier") seeks an order compelling Kenneth J. Catanzarite, Richard Vergel de Dios and the Catanzarite Law Corporation (collectively, "Catanzarite"), attorneys for Debtor, Eugene J. Perrine, Jr. ("Perrine") to disgorge undisclosed fees received by Catanzarite within one year before the filing of Perrine's bankruptcy petition allegedly "in contemplation of or in connection with" his bankruptcy case. Catanzarite objects to the disgorgement of the fees, claiming that the compensation was not received for services rendered either "in contemplation of or in connection with" Perrine's bankruptcy case. At the continued hearing, Kathleen Goldberg appeared for Speier and Richard Vergel de Dios appeared for Catanzarite and Perrine. The court, having considered Speier's motion and the opposition of Catanzarite and Perrine thereto, the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[1] pursuant to Fed. R. Civ. P.

---

[1] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. On March 30, 2007, Perrine filed a Notice of Request by Debtor's Counsel for Additional Findings of Fact and Conclusions of Law Re: Memorandum Decision Filed and Entered March 23, 2007 ("Notice"). The court has supplemented its findings of fact in this Amended Memorandum Decision in response to the Notice to clarify the factual basis for the court's decision. Insofar as the additional findings of fact and conclusions of law set forth in the Notice have not been incorporated into this Amended Memorandum Decision, Perrine's request is denied.

ORIGINAL

1  52, as incorporated into Fed. R. Bankr. P. 7052 and made applicable to contested

2  matters by Fed. R. Bankr. P. 9014(c).

3                              I. STATEMENT OF FACTS

4        Prior to August 8, 2003, Perrine owned as his separate property a 30.32 acre

5  tract of land located in Klamath Falls, Oregon ("Oregon Property").  On August 8, 2003,

6  Perrine transferred the Oregon Property to the Eugene H. Perrine and Vicki L Perrine

7  Family Trust dated August 8, 2003 ("Perrine Trust") by Trust Transfer Grant Deed

8  recorded on August 22, 2003, at Volume M03, Page 61460, Real Property Records,

9  Klamath County, Oregon.

10       The Perrine Trust is an <u>intervivos</u> revocable trust established in the name of

11 Perrine and his wife, Vicki.  Perrine is the trustor, co-trustee and beneficiary of the

12 Perrine Trust.  In addition to the Oregon Property, the assets of the Perrine Trust

13 ostensibly included at its inception the following marital property:

14       <u>Community Property</u>: "All items of tangible personal property, including, but not
         limited to, furniture and furnishings, silverware, clothing, books, collections of
15       tangible personal property, and other tangible personal property usually kept at
         the Trustor's residence."[2]

16       <u>Perrine's Separate Property</u>: (a) Real property and improvements located at 285
17       West Skyline Drive, La Habra Heights, California ("La Habra Property"),
         transferred into the Trust by Trust Transfer Grant Deed recorded on September
18       26, 2003, as Instrument No. 03-2864459, Official Records, Los Angeles County,
         California; (b) 50 shares of stock in Perrine Electric Company, Inc. and (c) a
19       pension at Schwab & Company, Inc.[3]

20 Section 1.02 of the Perrine Trust states, in pertinent part:

21       "All property now or hereafter conveyed or transferred to the [Trust] . . . shall
         remain, respectively, community property, quasi-community property, or the
22       separate property of the Trustor transferring such property to the Trustee."

23       Perrine is also the president of Perrine Electric Company, Inc. ("Perrine Electric").

24 On April 29, 2004, Perrine was sued by AAA Electrical Supply, Inc. ("AAA") in Case No.

25 ─────────────────────────

26 [2] The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule A.

27 [3] <u>See</u> The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule B.

                                        - 2 -

1  BC 324665, styled <u>AAA Electrical Supply, Inc. v. Perrine Electric Company, Inc. and</u>

2  <u>Eugene H. Perrine, Jr.</u>, in the Superior Court of Los Angeles County, for the sum of

3  $71,167.05, plus attorneys fees and costs, based upon his personal guaranty of the

4  debts of Perrine Electric. Catanzarite was the attorney of record for Perrine and Perrine

5  Electric in the state court action.

6       On January 11, 2005, Perrine and Vicki Perrine, Individually and as trustee,

7  executed a document entitled "Retainer Agreement and Application of In Kind Payment"

8  agreeing to transfer the Oregon Property to Catanzarite at a stipulated value of $30,000

9  for payment of accrued attorneys fees and costs and as a credit for future attorneys

10  fees and costs to be incurred by Perrine and Vicki Perrine. The Retainer Agreement

11  states specifically that the payment is "for the purpose of securing the continued

12  representation of the Trust and the individuals in future litigation including without

13  limitation, with creditors and to protect the home equity of Vicki and the pension of

14  Eugene." On January 13, 2005, Perrine and Vicki Perrine, as Co-Trustees of the Trust,

15  executed a Statutory Bargain and Sale Deed conveying the Oregon Property to

16  Kenneth J. Catanzarite for $30,000. The deed was recorded on January 14, 2005, at

17  Volume M05, Page 03482, Real Property Records, Klamath County, Oregon. Ten

18  days later, Perrine stipulated to entry of a judgment in the state court action in favor of

19  AAA in the amount of $76,767.

20       On April 21, 2005, Perrine filed his voluntary petition under chapter 7 of the

21  Bankruptcy Code.[4] Speier was appointed as trustee. In his schedules filed on May 6,

22

23

24  _____

25  [4] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of

26  2005, Pub. L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ. P.").

27

1  | 2005, Perrine disclosed assets valued at $415,740 and liabilities in excess of $174,073.[5]

2  | According to Schedule A, Perrine did not own an interest in any real property on the

3  | petition date.  Perrine's assets, as disclosed in Schedule B, consisted of cash, clothing,

4  | two vehicles, and his interest in a profit sharing plan valued at $400,000.  Perrine

5  | declared under penalty of perjury that he neither owned stock or an interest in a

6  | business at the time of bankruptcy[6] nor any interest in a trust on the petition date.[7]

7  |        In his Statement of Financial Affairs filed on May 6, 2005, Perrine declared under

8  | penalty of perjury that he had not made any payments to creditors within 90 days

9  | preceding the commencement of the case[8] nor transferred any property (other than in

10 | the ordinary course of business or financial affairs of the debtor) within one year

11 | preceding the date of bankruptcy.[9]  In response to Question # 9 of the Statement of

12 | Financial Affairs, Perrine disclosed that he had paid the sum of $3,000 to Catanzarite on

13 | January 14, 2005, for debt counseling or bankruptcy.

14 |        On May 6, 2005, Catanzarite filed a document entitled "Disclosure of

15 | Compensation of Attorney for Debtor" ("Rule 2016(b) Statement") signed by Richard

16 | Vergel de Dios on behalf of Catanzarite, stating:

17 |        Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the
       attorney for the above-named debtor(s) and that compensation paid to me within

18 |        one year before the filing of the petition in bankruptcy, or agreed to be paid to
       me, for services rendered or to be rendered on behalf of the debtor(s) in

19 |        contemplation of or in connection with the bankruptcy case is as follows:

20 |        For legal services, I have agreed to accept                        $3,000.00

21 | _____

22 | [5] In Schedule F, Perrine listed 9 creditors holding unsecured non-priority claims totaling $174,073.53.
     According to Schedules D and E, Perrine did not have any secured creditors or unsecured priority
23 | creditors on the petition date.

24 | [6] Schedule B, # 12.

25 | [7] Schedule B, # 19.

26 | [8] Statement of Financial Affairs, Question # 3.

27 | [9] Statement of Financial Affairs, Question # 10.

Prior to the filing of this statement I have received      $3,000.00
Balance Due      $     0.00

Mr. de Dios further certified that Catanzarite had agreed to accept $3,000 for the following legal services in the case:

> a.    Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
>
> b.    Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;
>
> c.    Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof; [and]
>
> d.    Representation of the debtor in adversary proceedings and other contested bankruptcy matters.[10]

Mr. de Dios's signature on the Rule 2016(b) Statement appears beneath the following certification:

> I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceedings.[11]

On May 23, 2005, Perrine appeared and was examined by Speier under oath at a meeting of creditors conducted pursuant to § 341(a).[12]  Based upon the examination and his investigation of Perrine's actions before bankruptcy, Speier filed a complaint in Adversary No. RS-05-01243 PC, styled Steven M. Speier, Chapter 7 Trustee v. Vicki L. Perrine, et. al., on June 15, 2005, seeking, in part, to recover as a fraudulent conveyance funds received by Perrine from the sale of the La Habra Property prior to bankruptcy, which were then transferred to Vicki and used to purchase, as her separate property, certain real property located at 4025 Prarie Dunes Drive, Corona, California.

---

[10] Rule 2016(b) Statement, p.1.

[11] Rule 2016(b) Statement, p.2.

[12] The Code requires a debtor to appear and submit to examination under oath at a meeting of creditors. 11 U.S.C. § 343; Fed. R. Bankr. P. 2003.  The examination focuses on the debtor's acts, conduct, property, liabilities and financial condition, as well as any matter which might affect the administration of the bankruptcy estate and the debtor's right to a discharge.  Fed. R. Bankr. P. 2004(b).

1       On July 15, 2005, Perrine filed a motion to dismiss his case pursuant to § 707(a),

2 alleging that Speier's fraudulent conveyance claims were unfounded and that the

3 unsecured non-priority creditors holding claims in excess of $174,000 would not suffer

4 significant legal prejudice by a dismissal of the case.[13] Perrine's dismissal motion was

5 opposed by Speier and Perrine's largest creditor, AAA.[14] On August 15, 2005, the court

6 denied Perrine's motion to dismiss finding that dismissal of the case would be prejudicial

7 to creditors.[15] An Order Denying Debtor's Motion for Voluntary Dismissal of Case was

8 entered on September 20, 2005. Shortly thereafter, Speier filed a complaint in

9 Adversary No. RS 05-01473 PC, styled <u>Steven M. Speier, Chapter 7 Trustee v. Eugene</u>

10 <u>H. Perrine, Jr.</u>, objecting to Perrine's discharge pursuant to § 727(a)(2)(A), (a)(3),

11 (a)(4)(A) and (a)(5).

12       On November 2, 2006, Speier filed a motion seeking an order compelling

13 Catanzarite to amend its Rule 2016(b) Statement to disclose the transfer of the Oregon

14 Property claiming that the property was received for services "in contemplation of or in

15 connection with" Perrine's bankruptcy case. Perrine and Catanzarite opposed the

16 motion, asserting that the fees incurred "in contemplation of or in connection with" the

17 bankruptcy case were limited to the $3,000 disclosed in the Rule 2016(b) Statement on

18 May 6, 2005, and that the Oregon Property was transferred to Catanzarite primarily for

19 _____

20 [13] In fact, Perrine's unsecured debt was substantially in excess of the amount disclosed in Schedule F.
On January 13, 2006, Perrine filed an Amended Schedule F disclosing 12 holders of unsecured non-

21 priority claims totaling $202,277.65.

22 [14] On November 29, 2005, AAA filed a proof of claim in the amount of $76,767 based upon the Stipulation
for Entry of Judgment entered in the state court action.

23 [15] A debtor has no absolute right to dismiss a chapter 7 case. <u>Bartee v. Ainsworth (In re Bartee)</u>, 317 B.R.

24 362, 366 (9th Cir. BAP 2004); <u>Leach v. U.S. (In re Leach)</u>, 130 B.R. 855, 857 n.5 (9th Cir. BAP 1991). In
the Ninth Circuit, "a voluntary Chapter 7 debtor is entitled to dismissal of his case so long as such

25 dismissal will cause no 'legal prejudice' to interested parties." <u>Leach</u>, 130 B.R. at 857. The debtor bears
the burden of proving that dismissal will not prejudice creditors. <u>Bartee</u>, 317 B.R. at 366. In this case,
Speier anticipated that there would be funds available to pay unsecured creditors, at least in part.

26 Dismissal would have resulted in prejudice to creditors because there was no guarantee that Perrine
would have paid their claims outside of bankruptcy. <u>Id.</u>

27

1  non-bankruptcy services.  Catanzarite explained that there was an outstanding balance

2  of $12,000 due the Catanzarite firm when it received the Oregon Property on January

3  14, 2005.  After payment of the outstanding balance, the $18,000 credit was used to

4  pay $3,000 in fees for preparation of the bankruptcy petition and "the remaining amount

5  was used to pay fees incurred pre-bankruptcy related to the AAA Electric litigation."[16]

6         At a hearing on December 4, 2006, the court determined that Perrine's transfer of

7  the Oregon Property to Catanzarite on January 14, 2005, within 97 days prior to the

8  filing of Perrine's bankruptcy petition, was made "in contemplation of or in connection

9  with" Perrine's bankruptcy case.  Catanzarite was ordered to amend its Rule 2016(b)

10 Statement to disclose all facts concerning its receipt of the Oregon Property.  A hearing

11 on the issue of disgorgement was continued to February 26, 2007.

12        On December 15, 2006, Catanzarite filed an Amended Disclosure of

13 Compensation of Attorney for Debtor ("Amended Rule 2016(b) Statement").

14 Catanzarite's Amended Rule 2016(b) Statement did not mention the Oregon Property

15

16 ───────────────

17 [16] Catanzarite's Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement
   of Compensation for Failure to Disclose on Statement 2016, p.3, l.6-10.  In a letter to Speier's attorney,
   Thomas H. Casey dated December 15, 2005, Catanzarite enclosed a document entitled "Client Ledger

18 Report" reflecting amounts billed to Perrine for legal services rendered by Catanzarite for the period from
   May 3, 2004 through April 26, 2005.  In the letter, Catanzarite explained that the ledger report

19 demonstrated that

20        "[A]s of December 22, 2004, the sum of $11,857.91 was due.  After receipt and credit of the land
       transfer amount on January 13, 2005 for $30,000, there was an $18,000 credit balance.  However,

21     fees incurred pre-bankruptcy related to the then pending litigation, as through the statement dated
       April 26, 2005, consumed all but $1,040.44.  The statement dated April 26, 2005 did not cover the

22     services for the period of April 15, 2005 through April 20, 2005. . . . the total amount accrued pre-
       petition was the sum of $2,615.

23
       As such, on the date of petition, there was no credit balance.  In fact, Perrine actually

24     owed the firm approximately $1,600 at that point in time.

25 Trustee's Motion to Compel Disgorgement of Compensation for Failure to Disclose on Statement 2016,
   Ex. 10.  In his statement of financial affairs, Perrine stated under penalty of perjury that he paid the $3,000

26 fee to Catanzarite on January 14, 2005.  The Client Ledger Report does not contain a specific billing entry
   for the $3,000 fee disclosed in the Rule 2016(b) Statement nor is the absence of the entry explained in

27 Catanzarite's letter of December 15, 2005.

1  nor explain the method used by Catanzarite and Perrine to arrive at the $30,000

2  "stipulated" value.  Catanzarite's Amended Rule 2016(b) Statement stated only that

3  "payments and credits received from the Debtor in the amount of $30,000 were paid on

4  behalf of the following categories: $21,000 in defense of the AAA Electrical litigation;

5  $3,000 with regard to the dispute with MBNA, $3,000 for pension work and $3,000 for

6  preparation of bankruptcy petition and schedules."[17]  Prior to the continued hearing,

7  Speier and Catanzarite filed supplemental memorandums of points and authorities on

8  the issue of disgorgement.  At the continued hearing on February 26, 2007, the matter

9  was taken under submission.

## II.  DISCUSSION

11         This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§

12  157(b) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A),

13  (B), (E) and (O).  Venue is appropriate in this court.  28 U.S.C. § 1409(a).

14  A.      Strict Duty of Disclosure

15         Section 329(a) requires a debtor's attorney to disclose to the court the amount of

16  compensation paid or promised for services rendered "in contemplation of or in

17  connection with the case."[18]  Section 329(a) is implemented by Rule 2016(b) which

_____

[17] Amended Rule 2016(b) Statement, p.3, l.14-18.  Catanzarite actually received payments and credits totaling $33,616.50 between April 22, 2004 and April 21, 2005, for legal services rendered and costs advanced on behalf of Perrine.  This amount included the sum of $3,616.50 received by Catanzarite on August 18, 2004, for services rendered in conjunction with certain accounting and compliance issues that arose under a stipulated order concerning the division of a qualified retirement plan previously entered in Perrine's divorce case.  At the hearing on December 4, 2006, the court determined that the sum of $3,616.50 was not paid to Catanzarite on August 18, 2004, in contemplation of Perrine's bankruptcy case.

[18] Section 329(a) states:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

1   requires the filing of the statement required by § 329(a) not later than 15 days after the

2   order for relief.[19]  Rule 2016(b) imposes a continuing duty on debtor's counsel to

3   supplement the original statement pursuant to § 329(a).[20]  The disclosure requirements

4   of § 329(a) apply "whether or not the attorney ever applies for compensation . . . ."

5   Consumer Seven Corp. v. United States Trustee (In re Fraga), 210 B.R. 812, 822 (9th

6   Cir. BAP 1997).

7        Rule 2017(a) directs the court to determine, either sua sponte or upon motion by

8   a party in interest, whether any payment or transfer of property to an attorney "in

9   contemplation of" the filing of the bankruptcy petition is excessive.[21]  Taken together, §

10  329(a) and Rule 2017(a) "furnish the court with express power to review payments to

11  attorneys for excessiveness and to restore the status quo when assets have

12  improvidently been bartered for legal services[.]"  In re Martin, 817 F.2d 175, 180 (1st

13  _____

14  11 U.S.C. § 329(a).

15  [19] Rule 2016(b) provides:

16      Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and
        transmit to the United States trustee within 15 days after the order for relief, or at another time as

17      the court may direct, the statement required by § 329 of the Code including whether the attorney
        has shared or agreed to share the compensation with any other entity.  The statement shall

18      include the particulars of any such sharing or agreement to share by the attorney, but the details
        of any agreement for the sharing of the compensation with a member or regular associate of the

19      attorney's law firm shall not be required.  A supplemental statement shall be filed and transmitted
        to the United States trustee within 15 days after any payment or agreement not previously

20      disclosed.

21  Fed. R. Bankr. P. 2016(b).

22  [20] Id.

23  [21] Rule 2017(a) states, in pertinent part:

24      On motion by any party in interest or on the court's own initiative, the court after notice and a
        hearing may determine whether any payment of money or any transfer of property by the debtor,

25      made directly or indirectly and in contemplation of the filing of a petition under the Code by or
        against the debtor or before entry of the order for relief in an involuntary case, to an attorney for

26      services rendered or to be rendered is excessive.

27  Fed. R. Bankr. P. 2017(a) (emphasis added).

1  Cir. 1987).

2  　　　Section 329's disclosure requirements are "'mandatory, not permissive.'" <u>Turner</u>

3  <u>v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.)</u>, 4 F.3d 1556, 1565 (10th

4  Cir. 1993) (quoting <u>In re Bennett</u>, 133 B.R. 374, 378 (Bankr. N.D. Tex. 1991)); <u>In re</u>

5  <u>Keller Fin. Servs. of Fla., Inc.</u>, 248 B.R. 859, 883 (Bankr. M.D. Fla. 2000).  Section

6  329(a), which is derived from § 60(d) of the Bankruptcy Act of 1898,[22] seeks to prevent

7  overreaching by debtor's attorneys and serves to counteract "'the temptation of a failing

8  debtor to deal too liberally with his property in employing counsel to protect him in view

9  of financial reverses and probable failure.'" <u>Conrad, Rubin & Lesser</u>, 289 U.S. at 477-

10  78 (quoting <u>In re Wood</u>, 210 U.S. 246 (1908)).  Section 329(a) demands that an

11  attorney be forthright in disclosing "the precise nature of the fee arrangement" with the

12  debtor.  <u>Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park-Helena Corp.)</u>, 63 F.3d

13  _____

14  [22] Section 60(d) of the Bankruptcy Act of 1898 provided:

15  　　　If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him,
　　　pay money or transfer property to an attorney and counselor at law, solicitor in equity, or proctor in
16  　　　admiralty for services to be rendered, the transaction shall be reexamined by the court on petition
　　　of the trustee or any creditor, and shall only be held valid to the extent of a reasonable amount to
17  　　　be determined by the court, and the excess may be recovered by the trustee for the benefit of the
　　　estate.

18  Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, § 60(d), <u>superceded by</u> Bankruptcy Reform Act of 1978,
19  Pub.L.No. 95-598, 11 U.S.C. § 329.  In <u>Conrad, Rubin & Lesser v. Pender</u>, the Supreme Court discussed
the scope of § 60(d), explaining:

20  　　　It contains no intimation of an intention to limit the jurisdiction to re-examine to a particular sort of
21  　　　legal services for the payment of which the debtor has disposed of his property.  The point of the
　　　provision conferring jurisdiction for a summary re-examination is not the specific nature of the
22  　　　legal services to be rendered, but that the payment or transfer to provide for them is made "in
　　　contemplation of" bankruptcy.  The purpose is shown by the sweeping description of payments or
23  　　　transfers "to an attorney and counselor at law, solicitor in equity, or proctor in admiralty."

24  289 U.S. 472, 476-77 (1933) (quoting Bankruptcy Act of 1898, § 60(d)).  This broad scope of review
survives in the language of Rule 2017(a).  <u>See</u> <u>In re Rheuban</u>, 121 B.R. 368, 376 (Bankr. C.D. Cal. 1990)
25  (concluding that "decisions interpreting and applying predecessors of § 329 and Bankruptcy Rule 2017(a)
remain persuasive and, in certain instances, are controlling . . . ."); <u>rev'd in part on other grounds</u>, 124 B.R.
26  301 (C.D. Cal. 1990), <u>on remand</u>, 128 B.R. 551 (Bankr. C.D. Cal. 1991); <u>In re GIC Gov't Sec., Inc.</u>, 92
B.R. 525, 530 (Bankr. M.D. Fla. 1988) (stating that "the principles enunciated by pre-Code cases
27  interpreting § 60(d) of the Bankruptcy Act of 1898 are still controlling").

- 10 -

877, 881 (9th Cir. 1995) (quoting In re Glenn Elec. Sales Corp., 99 B.R. 596, 600

(D.N.J. 1988). "Counsel's fee revelations must be direct and comprehensive. Coy or

incomplete disclosures which leave the court to ferret out pertinent information from

other sources are not sufficient." In re Saturley, 131 B.R. 509, 517 (Bankr. D. Me.

1991).

Congress intended to permit bankruptcy courts to reexamine the reasonableness

of fees within the one-year look back period, irrespective of the nature of the services

rendered. See Keller Fin. Servs., 248 B.R. at 878 (concluding that § 329 permits the

court to review fees paid for services "performed at a time when the debtor was

contemplating bankruptcy," regardless of the nature of the services (internal quotations

omitted)); Wooton v. Dixon (In re Dixon), 143 B.R. 671, 678 (Bankr. N.D. Tex. 1992)

(stating that § 329 "imposes no restriction on the nature of the services rendered . . .");

Rheuban, 121 B.R. at 378 (observing that § 329 does not limit the nature of the legal

services that are subject to reexamination). Absent complete disclosure, the court is

unable to make an informed judgment regarding the nature and amount of

compensation paid or promised by the debtor for legal services in contemplation of

bankruptcy.

The failure to satisfy the disclosure requirements of § 329(a) and Rule 2016(b)

may result in sanctions, "even if proper disclosure would have shown that the attorney

had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule."

Park-Helena Corp., 63 F.3d at 880; Fraga, 210 B.R. at 822. An attorney who violates §

329(a) and Rule 2016(b) forfeits any right to receive compensation for services

rendered on behalf of the debtor and may be ordered to disgorge fees already received.

See, e.g., Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis), 113 F.3d 1040,

1045 (9th Cir. 1997) (concluding that "[a]n attorney's failure to obey the disclosure and

reporting requirements of the Bankruptcy Code and Rules gives the bankruptcy court

1    the discretion to order disgorgement of attorney's fees"); <u>Park-Helena Corp.</u>, 63 F.3d at

2    882 ("Even a negligent or inadvertent failure to disclose fully relevant information [in a

3    Rule 2016 statement] may result in a denial of all requested fees."); <u>Jensen v. U.S.</u>

4    <u>Trustee (In re Smitty's Truck Stop, Inc.)</u>, 210 B.R. 844, 849 (10th Cir. BAP 1997)

5    (stating that an attorney's failure to disclose a retainer in his Rule 2016(b) statement is

6    sufficient to deny all fees, even if the non-disclosure was negligent or inadvertent);

7    <u>Fraga</u>, 210 B.R. at 822 ("The consequences of an attorney's violation of the disclosure

8    requirements regarding fees include denial of all fees requested.").

9    B.    <u>Services "In Contemplation of" the Bankruptcy Case</u>

10          Courts broadly apply a <u>subjective test</u> to determine whether attorneys fee

11   payments were made "in contemplation of" bankruptcy.  <u>Dixon</u>, 143 B.R. at 675 n.3

12   (observing that "[a] subjective and not an objective test applies in determining whether

13   payments to attorneys were made 'in contemplation of bankruptcy.'"); <u>Rheuban</u>, 121

14   B.R. at 378 (stating that a "<u>subjective</u> review [is] embodied in the 'in contemplation of'

15   language of § 329 and its predecessors, § 60(d) and Bankruptcy Rule 220").  The

16   subjective inquiry is "whether the debtor was influenced by the possibility or imminence

17   of a bankruptcy proceeding in making the transfer."  <u>Brown v. Luker (In re Zepecki)</u>, 258

18   B.R. 719, 724 (8th Cir. BAP 2001), <u>aff'd</u>, 277 F.3d 1041 (8th Cir. 2002); <u>see</u> <u>Dixon</u>, 143

19   B.R. at 675 n.3 (articulating the standard as "whether, in making the transfer, the debtor

20   is influenced by the possibility or imminence of a bankruptcy proceeding").  The

21   "controlling question," as the Supreme Court explained in <u>Conrad, Rubin & Lesser</u>, "is

22   with respect to the state of mind of the debtor and whether the thought of bankruptcy

23   was the impelling cause of the transaction."  289 U.S. at 477.

24          If the payment or transfer was thus motivated, it may be re-examined and its
             reasonableness be determined.  Undoubtedly, while the question thus relates to
25           the debtor's motive, the nature of the services which he seeks and for which he
             pays may be taken into consideration as it may throw light upon his motive.  It is
26           not impossible that the services may have been so wholly separate from any
             exigency of bankruptcy as to indicate that the thought of bankruptcy was in no

27

                                    - 12 -

1   sense controlling. But, given the fact that the payment or transfer was in
contemplation of bankruptcy, the inducement of the transaction affords, from the
2   standpoint of the statute, sufficient ground for authorizing a summary inquiry into
its reasonableness. The manifest purpose of the provision is to safeguard the
3   assets of those who are acting in contemplation of bankruptcy, so that these
assets may be brought quickly and without unnecessary expense into the hands
4   of the trustee, and to provide a restraint upon opportunities to make an
unreasonable disposition of property through arrangement for excessive
5   payments for prospective legal services.

6   Id.

7        Services aimed at the prevention of bankruptcy likewise necessarily contemplate

8   bankruptcy, and compensation received for such services falls within the ambit of §

9   329(a). See, e.g., Conrad, Rubin & Lesser, 289 U.S. at 479 (holding that the court had

10  jurisdiction to review fees paid to an attorney retained by debtor to negotiate a 50%

11  cash settlement with creditors prior to bankruptcy, and opining that "[a] man is usually

12  very much in contemplation of a result which he employs counsel to avoid"); Matter of

13  Prudhomme, 43 F.3d 1000, 1004 (5th Cir. 1995) (holding that evidence suggesting that

14  the debtors, who in desperate financial straits, consulted an attorney for representation

15  to restructure debt and resolve disputes with their largest creditor supported a finding

16  that the fee was paid in contemplation of or in connection with the case); In re Greco,

17  246 B.R. 226, 231 (Bankr. E.D. Pa 2000) (holding that a $2,200 payment to an attorney

18  two months before bankruptcy for legal research concerning the effect of bankruptcy on

19  the debtor's student loans was "in contemplation of" bankruptcy); Rheuban, 121 B.R. at

20  379 (finding that debtor acted "in contemplation of bankruptcy" upon entering into a fee

21  agreement with a firm to represent him in connection with investigation and litigation of

22  possible criminal and regulatory matters arising out of debtor's business relationship

23  with a savings & loan); GIC Gov't Sec., 92 B.R. at 533 (concluding that payments made

24  to attorneys retained on the eve of bankruptcy to resist efforts by the State of Florida to

25  revoke the debtor's securities registration were "in contemplation of" bankruptcy).

26  Those cases in which a debtor's counsel has received undisclosed non-exempt assets

27

- 13 -

1  shortly before bankruptcy as compensation primarily for future services have merited

2  particularly close scrutiny by bankruptcy courts.

3      In <u>Dixon</u>, an attorney, William H. Ravkind ("Ravkind") was employed by Don Ray

4  Dixon ("Dixon") in November 1986, to represent him in criminal matters arising out of his

5  association with Dondi Financial Corporation and Vernon Savings & Loan Association

6  for a flat fee of $450,000.  143 B.R. at 673.  Ravkind ultimately received $200,000 in

7  cash and certain artwork valued at $100,000 as payment in full.  <u>Id</u>. at 674.  The cash

8  and artwork, which were Dixon's non-exempt assets, were paid for future services to be

9  rendered by Ravkind.  <u>See id</u>.  At the time he received the transfer, Ravkind was aware

10 that Dixon was considering bankruptcy.  <u>Id</u>.  Ravkind and Dixon were concerned that

11 the federal government was planning to seize Dixon's assets pursuant to the Racketeer

12 Influenced and Corrupt Organizations Act.[23]  <u>Id</u>.  Ravkind immediately deposited the

13 $200,000 cash in his operating account and used the funds to pay business expenses.

14 <u>Id</u>.  Ravkind then sold most of the artwork for less than $25,000.  <u>Id</u>. at 675.

15     On April 22, 1987, Dixon filed a voluntary petition under chapter 11 of the Code.

16 <u>Id</u>. at 673.  Ravkind was not Dixon's general counsel in the bankruptcy case, but

17 continued to represent him on criminal matters after the petition date.  <u>Id</u>. at 674.  Dixon

18 disclosed the $300,000 transfer to Ravkind in his statement of financial affairs.  <u>See id</u>.

19 at 675.  However, Ravkind failed to timely disclose the $300,000 fee and his agreement

20 with Dixon pursuant to § 329(a) and Rule 2016(b).  <u>Id</u>.  Furthermore, Ravkind neither

21 sought authorization to act as special counsel for Dixon under § 327(e) nor

22 authorization to use any unearned portion of the $300,000 retainer in his possession.

23 <u>Id</u>.

24     On October 14, 1987, Dale Wooten, as chapter 11 trustee, filed a complaint

25 seeking to recover the $300,000 fee from Ravkind as a fraudulent transfer under §

26 _____

27 [23] 18 U.S.C. § 1961, <u>et. seq</u>.

- 14 -

1  548(a).  Id. at 673.  It was undisputed that at all material times, Dixon was insolvent

2  within the meaning of § 548(a).  See id. at 674.  Ravkind had not kept time records, but

3  the evidence supported a finding that he had earned approximately $35,000 for legal

4  services rendered to Dixon prior to bankruptcy.  Id.  It was also undisputed that the

5  reasonable value of Ravkind's post-petition criminal defense work, which accounted for

6  the majority of his services to Dixon, exceeded the amount that he had been paid.  Id.

7      Although relief was sought by the trustee under § 548(a), the bankruptcy court

8  concluded that "the more appropriate standard" for review of Ravkind's fee arrangement

9  with Dixon was § 329(a) and § 330.  Id. at 673.  Applying a subjective test, the

10 bankruptcy court found that Dixon's $300,000 transfer to Ravkind was made in

11 contemplation of bankruptcy, stating:

12      Prior to the filing of the bankruptcy proceedings, Dixon was the target of several
       major criminal investigations, and had received national media attention as an
13     alleged central figure in the savings and loan scandal.  At the time [Ravkind]
       received the money and art as a payment from Dixon, both he and Dixon were
14     concerned that Dixon's assets might be seized under a RICO seizure.
       Bankruptcy counsel had already been retained for the Debtors in California, and
15     Debtors were insolvent.  From the testimony adduced at trial, it was clear the
       cash payment and art represented part of the last liquid and available assets of
16     the Debtors.  At the time [Ravkind] was engaged, he undertook representation of
       Dixon in several criminal investigations, and related civil suits with the Federal
17     Deposit Insurance Corporation (the "FDIC").  In addition, he participated with
       Dixon's California bankruptcy lawyers in some bankruptcy planning.  At the time
18     [Ravkind] received the transfers of Dixon's money and property, Dixon's general
       counsel Simmons was parceling out funds and property for retainers.  The Court
19     finds that the transfers were received by [Ravkind] within a year of the filing of
       bankruptcy, in contemplation of a bankruptcy proceeding, and that, therefore,
20     [Ravkind's] fee arrangement is subject to review under § 329 of the Code.

21 Id. at 675 n.3.  The court then ordered Ravkind to disgorge all but $35,000 of the

22 payment received from Dixon, i.e., the remaining art on hand, $160,000 of the cash

23 received, and $90,000 representing the value of the artwork disposed of, finding that the

24 fee arrangement was excessive and violated § 329 and § 330.  Id. at 679.  The court

25 also determined that Ravkind's failure to disclose the $300,000 fee and agreement with

26 Dixon pursuant to § 329(a) and Rule 2016(b) constituted "an independent and

27

- 15 -

alternative basis" for disgorgement of the fees. Id. at 680.  In ordering the

disgorgement, the court concluded that Ravkind's criminal defense work was personal

to Dixon and resulted in no benefit to creditors or the estate, stating "the only thing the

transfers to [Ravkind] achieved was to further deplete the assets of the bankruptcy

estate." Id. at 679.

In Zepecki, Robert Zepecki ("Zepecki") filed a voluntary chapter 7 petition on

February 7, 1996.  277 F.3d at 1043.  Three months earlier, Zepecki's attorney, Steven

C.R. Brown ("Brown") had received the net proceeds of $102,989 from the sale of

certain real property owned by Zepecki in Illinois pursuant to a "1031 Exchange of

Property Escrow Agreement."[24]  Id. at 1044.  Acting as escrow agent under the

agreement, Brown disbursed the sum of $65,000 to the bank account of a third party,

Ted Holder ("Holder") prior to Zepecki's bankruptcy.  Id.  The balance was disbursed by

Brown to Holder shortly after the petition date.  Id.  Brown received $40,000 in attorneys

fees as part of the transaction, $20,000 following each payment to Holder.  Id.

Zepecki failed to disclose in his schedules and statements either the sale of the

Illinois property or the transfer of the sale proceeds to Brown.  Id. at 1043.  The

bankruptcy court denied Zepecki's discharge under § 727(a)(4), and sua sponte ordered

Brown to account for the $40,000 fee received under the agreement.  Id. at 1043-44.

Brown documented attorneys fees and expenses totaling $7,160 incurred prior to

Zepecki's bankruptcy in conjunction with the tax-free exchange.  Id. at 1044.  Ultimately,

the bankruptcy court determined that the $40,000 fee was paid to Brown in

contemplation of or in connection with Zepecki's bankruptcy.  Id. at 1046.  Brown was

ordered to disgorge fees of $32,840 to the estate, representing the entire post-petition

---

[24]  Zepecki sought avoid capital gains on the sale of the Illinois property by effectuating a tax-free
exchange of property under § 1031 of the Internal Revenue Code.  26 U.S.C. § 1031.  The parties to the
1031 Exchange of Property Escrow Agreement drafted by Brown included Zepecki, B&B Diversified
Resources, Inc., Zepecki's closely held corporation, Brown, and the purchaser of the real estate identified
as James Burch.  Zepecki, 277 F.3d at 1044.

1  fee of $20,000 and $12,840 of the $20,000 fee received prior to the petition date. Id. at

2  1044.  Brown appealed and the Bankruptcy Appellate Panel for the Eighth Circuit

3  affirmed. Zepecki, 258 B.R. at 726.  The Eighth Circuit then affirmed the judgment of

4  the Bankruptcy Appellate Panel, holding:

5  > We also find no clear error in the bankruptcy court's finding that Brown's
> representation was in connection with or in contemplation of the possibility or
6  > imminence of a bankruptcy proceeding.  The Illinois land transaction occurred
> within one month after Zepecki's divorce from Ms. Kania, who was Zepecki's
7  > largest creditor, and within four months prior to the bankruptcy filing.  The
> proceeds of the land sale constituted Zepecki's largest asset with which to satisfy
8  > Ms. Kania's judgment.  The bankruptcy court found that the land transaction was
> a sham and was performed in an effort to prevent the asset from becoming
9  > property of Zepecki's bankruptcy estate and prevent his ex-wife from recovering
> on her judgment.  Zepecki lost his right to a bankruptcy discharge because he
10 > failed to identify the transaction or its proceeds on his bankruptcy schedules,
> which further supports the court's conclusion that Zepecki was trying to keep the
11 > asset from his wife.  These facts support the bankruptcy court's conclusion that
> Zepecki was contemplating bankruptcy when he transferred the Illinois property
12 > and when Brown assisted in the attempted section 1031 transfer of that same
> property.

13 Zepecki, 277 F.3d at 1046.

14 C.   Perrine Transferred the Oregon Property to Catanzarite In Contemplation of
15      Bankruptcy

16       As the Supreme Court explained in Conrad, Rubin & Lesser, the test for

17 determining if a payment or transfer was made "in contemplation of" bankruptcy hinges

18 upon the debtor's state of mind and, more precisely, "whether the thought of bankruptcy

19 was the impelling cause of the transaction." 289 U.S. at 477.  Four months prior to

20 bankruptcy, Perrine was embroiled in a lawsuit with AAA, his largest creditor.  On the

21 eve of trial, Perrine transferred the Oregon Property from the Perrine Trust to his

22 attorney, Catanzarite.  The Perrine Trust specifically provided that the Oregon Property

23 remained Perrine's separate property, notwithstanding its inclusion in the trust.  The

24 Oregon Property was Perrine's last and most significant non-exempt asset.  At the time

25 of the transfer, Catanzarite and Perrine had to have been concerned that the Oregon

26 Property would be seized by AAA to satisfy any judgment that might be entered against

27

1  Perrine in the state court action.  Catanzarite concedes that once it received the Oregon

2  Property, there was "no property remaining in the trust to satisfy creditors."[25]  With the

3  Oregon Property in the hands of Catanzarite, Perrine stipulated to a judgment with AAA

4  ten days later.

5      Moreover, the language of Catanzarite's retainer agreement belies any notion

6  that the Oregon Property was not transferred in contemplation of bankruptcy.  Like

7  Dixon, the transfer was intended to barter non-exempt assets primarily for future legal

8  services to be rendered by Catanzarite.  Perrine transferred the Oregon Property to

9  Catanzarite 97 days prior to his bankruptcy, after exhausting efforts to litigate with his

10  largest creditor, and for the stated purpose of "securing the continued representation of

11  the Trust and the individuals in future litigation including without limitation, with creditors

12  and to protect the home equity of Vicki and the pension of Eugene."[26]  The Oregon

13  Property was given a "stipulated" value of $30,000 by Perrine to Catanzarite, but

14  Catanzarite was owed only $12,000 at the time of the transfer.  As in Dixon, the effect of

15  the transfer was to further deplete the assets of the estate.

16      Catanzarite argues that Perrine did not contemplate or intend to file bankruptcy

17  at the time he was sued by AAA on April 29, 2004.[27]  The critical date, however, is the

18  date of the transfer of the Oregon Property.  The only direct evidence of Perrine's state

19  of mind on January 14, 2005, is Perrine's deposition testimony that he "never really

20  wanted to declare bankruptcy" and, in response to a question as to whether he was

21  thinking about filing bankruptcy in January 2005, Debtor responded "I don't know."

22

23  [25] Reply in Support of Supplemental Memorandum of Points and Authorities in Support of Reasonableness of Fees Incurred By Catanzarite Law Corporation, p.3, l.19-20.

24  [26] Retainer Agreement and Application of In Kind Payment, executed on January 11, 2005, Eugene H.
25  Perrine and Vicki L. Perrine, Individually and as Trustee and Kenneth J. Catanzarite, Individually and as President of Catanzarite Law Corporation.

26  [27] Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement of Compensation for Failure to Disclose on Statement 2016, p.2, 23-24.
27

1  Even Perrine's deposition testimony lacks credibility when weighed against the facts as
2  they existed 97 days prior to bankruptcy.

3      At the hearing on December 4, 2006, Catanzarite conceded that Perrine "wanted
4  to avoid bankruptcy." Catanzarite explained that Perrine's business "operated from one
5  large job to another," and that his client had been "down in the hole before" but he
6  would receive "the golden phone call . . . where it was a big job would come in and it,
7  pull his company out of its abyss, financial abyss." Taken together, these facts support
8  a finding that Perrine was contemplating the possibility or imminence of bankruptcy
9  when he transferred the Oregon Property to Catanzarite on January 14, 2005, and that
10 the transfer is subject to review under § 329(a) and Rule 2017(a).

11 D.  <u>Catanzarite Failed to Disclose Property Transferred to Catanzarite in Payment
    for Legal Services Rendered, or To Be Rendered, in Contemplation of Perrine's
12  Bankruptcy Case</u>

13     Section 329(a) and Rule 2016(b) required that Catanzarite's disclosures be full,
14 candid and complete. Catanzarite timely filed a Rule 2016(b) Statement in this case,
15 but failed to disclose fully and candidly in its Rule 2016(b) Statement the precise nature
16 of its fee agreement with Perrine. Catanzarite's failure to disclose its complete
17 relationship with Perrine was neither negligent or inadvertent. Notwithstanding its
18 receipt of the Oregon Property pursuant to its retainer agreement with Perrine,
19 Catanzarite made a purposeful calculation of the amount that it chose to disclose in its
20 Rule 2016(b) Statement. Catanzarite did not receive the sum of $3,000 from Perrine for
21 legal services, as certified in its Rule 2016(b) Statement. On the contrary, Catanzarite
22 received a transfer of the Oregon Property from the Perrine Trust on January 14, 2005,
23 with a stipulated value of $30,000. Catanzarite then apportioned a value of $3,000 from
24 the $30,000 transfer for legal services ostensibly rendered to Perrine in contemplation
25 of or in connection with his bankruptcy case. No facts concerning Catanzarite's retainer
26 agreement nor its receipt of the Oregon Property 97 days prior to bankruptcy were

27

- 19 -

1  disclosed in either the Rule 2016(b) Statement or the Amended Rule 2016(b)

2  Statement.  Nor did Catanzarite disclose the method used to calculate the $30,000

3  "stipulated" value of the Oregon Property.  Neither the retainer agreement nor the

4  transfer of the Oregon Property to Catanzarite were disclosed by Perrine in the

5  statement of financial affairs prepared by Catanzarite and filed with the court.

6       An attorney who neglects to satisfy the disclosure requirements of § 329(a) and

7  Rule 2016(b), whether willfully or inadvertently, forfeits any right to receive

8  compensation for services rendered on behalf of the debtor and may be ordered to

9  return fees already received.  See Keller Fin. Servs., 248 B.R. at 885 (stating that

10  "[t]here are no measurable damages which result from the non-disclosure of

11  compensation required by § 329").  Given the gravity of Catanzarite's non-disclosure,

12  the court will deny all fees to Catanzarite for legal services rendered to Perrine to the

13  petition date due to its failure to comply with § 329(a) and Rule 2016(b).[28]  Catanzarite

14  will be ordered to disgorge and turn over to Speier either the Oregon Property or its

15  stipulated value of $30,000, at the election of the trustee, for the benefit of the estate.

16                                  III. CONCLUSION

17       Ninety-seven days prior to bankruptcy, Perrine transferred the Oregon Property

18  to Catanzarite for legal services rendered, or to be rendered, in contemplation of his

19  bankruptcy case.  Catanzarite's failure to disclose both its retainer agreement with

20  _____

21  [28] In reaching its conclusion, the court makes no finding as to the reasonableness of the fees sought by
    Catanzarite for legal services rendered on behalf of Perrine prior to bankruptcy.  See Lewis, 113 F.3d at
22  1046 (holding that where non-disclosure results in an order for disgorgement of all fees, an inquiry into the
    appropriate amount of the fee is not required).  The court notes, however, that the bulk of Catanzarite's
23  pre-petition fees were incurred defending Perrine in the AAA litigation for which Catanzarite ultimately
    disclosed a fee of $21,077.93.  Under § 329(b), Catanzarite bore the burden of establishing the
24  reasonableness of its fees.  Hale v. United States Trustee (In re Basham), 208 B.R. 926, 931-32 (9th Cir.
    BAP 1997) (stating that "[t]he burden is on the applicant to demonstrate that the fees are reasonable").
25  The court questions the reasonableness of Catanzarite's fee for the AAA litigation, particularly in light of
    the results obtained.  AAA sued Perrine for $71,167.05, plus interest, attorneys fees and costs.  The AAA
26  litigation was concluded with a stipulated judgment for $75,000 - 10 days after Catanzarite received the
    Oregon Property.  Moreover, Catanzarite admitted that, at the time of the transfer, fees attributable to the
    AAA litigation were only $12,000.

27                                       - 20 -

1    Perrine and its receipt of the Oregon Property pursuant to such retainer agreement, as

2    mandated by § 329(a) and Rule 2016(b), warrants disgorgement of the Oregon Property

3    and denial of fees.

4         A separate order will be entered consistent with this opinion.

5    Dated: April 13, 2007

                                    PETER H. CARROLL
6                                   United States Bankruptcy Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**NOTE TO USERS OF THIS FORM:**
*Physically attach this form as the last page of the proposed Order or Judgment.*
*Do **not** file this form as a separate document.*

| In re EUGENE H. PERRINE, JR., | CHAPTER 7 |
|---|---|
| Debtor. | CASE NUMBER RS 05-13979 PC |

## NOTICE OF ENTRY OF JUDGMENT OR ORDER
## AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST ON THE ATTACHED SERVICE LIST:

1.    You are hereby notified, pursuant to Local Bankruptcy Rule 9021-1(a)(1)(E), that a judgment or order entitled *(specify)*: AMENDED MEMORANDUM DECISION

was entered on *(specify date)*:    APR 1 6 2007

2.    I hereby certify that I mailed a copy of this notice and a true copy of the order or judgment to the persons and entities on the attached service list on *(specify date)*:    APR 1 6 2007

Dated:    APR 1 6 2007

JON D. CERETTO
**Clerk of the Bankruptcy Court**

By:_____
*Deputy Clerk*

*Rev. 1/01*  This form is optional.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.    **F 9021-1.1**

Service List


Eugene H. Perrine, Jr.
4025 Prairie Dunes
Corona, CA 92883


Kenneth J. Catanzarite, Esq.
Richard Vergel de Dios, Esq.
Catanzarite Law Corporation
2331 West Lincoln Avenue
Anaheim, CA 92801


Steven Speier
Chapter 7 Trustee
3403 Tenth Street, Suite 742
Riverside, CA 92501


United States Trustee
3685 Main Street, Suite 300
Riverside, CA 92501


Thomas H. Casey, Esq,
Kathleen Goldberg, Esq.
Law Office of Thomas H. Casey, Inc.
22342 Avenida Empresa, Suite 260
Rancho Santa Margarita, Ca 92688